UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA                    SENTENCING MEMORANDUM

    -against-                                            24-CR-364 (MKV)


Ferdinand Quinones,

                Defendant
---------------------------------------------------X


**SENTENCING MEMORANDUM OF DEFENDANT FERDINAN QUINONES**




RESPECTFULLY SUBMITTED,


Cohen Forman Barone, PC
BY: David J. Cohen
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com
212-766-9111

1

**INTRODUCTION**

Ferdinan Quinones comes before the Court for his August 26, 2025 sentencing hearing after having pled guilty on March 13, 2025, pursuant to his agreement with the government[1], to the first count of the indictment against him in violation of 21 U.S.C. § 841(b)(1)(C). A repentant and very young of man of just 22 years, Mr. Quinones and his loved ones[2], respectfully pray for the Court's justice and mercy in conducting its analysis of the appropriate sentence to be imposed upon him for his criminal actions. A full reading of the relevant information provided is designed to aid the Court when fixing a just punishment that is no greater than necessary to meet the goals of sentencing.

## I.      18 U.S.C. §3553(A) FACTORS

*18 U.S.C. § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

### The Nature and Circumstances of the Offense

Ferdinan Luis Andres Quinones Cruz (herein after referred to alternatively as: "Mr. Quinones", "Ferdinan", or "Defendant") was charged with and has pled guilty to acting contrary to 21 U.S.C. § 841(b)(1)(C) in violating 21 U.S.C. § 846. Specifically, Mr. Quinones pled guilty to knowingly and intentionally conspiring with others to distribute and to possess with the intent to distribute, cocaine base. See generally, *Plea Allocution*; see also, *PSR ¶ 25*. Mr. Quinones also concedes, consistent with his plea agreement with the government, his possession of two firearms at the time of his January 5, 2024 arrest. See, *Plea Agreement, Page 2*; see also, *PSR ¶ 28*.

The offense conduct is, no doubt, very serious and entails the defendant having contributed to the spread of dangerous, habit-forming, drugs in the community. As someone who has recently

---

[1] See generally, *Plea Agreement dated January 30, 2025*
[2] See generally, Exh. A, *Supporting Statements*.

2

struggled with substance abuse problems already in his young life--including during the period of time that his offending conduct escalated, culminating in his January 2024 arrest and imprisonment since-- Mr. Quinones recognizes and has reflected upon the destructive effect of addictive narcotic drugs on individuals and families. Moreover, for Ferdinan, the realization is inescapable that the would-be positive relationships and institutions in his life that have been consumed, infected, and plagued by this disease. The serious nature of his offense certainly warrants serious consequences, and Mr. Quinones, incarcerated for the last 19 months, understands and acknowledges this reality completely.  As such, he fully accepts responsibility for his criminal offense as well as the punishment he will receive from the Court on his sentencing date.

***History and Characteristics of Ferdinand Quinones***

    i.      *A Childhood Without Parents or Safety and the Traumatic Loss of Elder Brother*

Mr. Quinones was born on September 4, 2002, in Waterbury, Connecticut, to the non-marital union of a father of the same name (who he has never met) and a mother, Mildred Cruz, whose rights were terminated when Ferdinan was only three (3) years old due to her substance abuse and mental health struggles. He has seen his mother only once since that time[3] and has no knowledge of her whereabouts at the present time. See, *PSR ¶ 45.*

After being removed from his mother's custody at only three years old by the State of Connecticut, Mr. Quinones and his older maternal half-brother, Timothy Ramos, were placed with a relative of Timothy's, Ms. Claribel Gonzalez. Sadly, this placement rather than providing safety and stability, subjected the boys to daily physical and verbal abuse at the hands of Ms. Gonzalez. The abuse became more acute after the death of Ms. Gonzalez' own son, when the defendant was

---

[3] Indeed, this sole occasion was when Ferdinan was thirteen (13), at the funeral of his elder brother who had died in a tragic and sudden manner as discussed, *infra.*

just eight (8) and still living in her care. See generally, *PSR ¶¶ 47, 50*. After moving Ferdinan and Timothy from Connecticut to Sabana Grande, Puerto Rico, Ms. Gonzalez would administer discipline by beating Ferdinan and Timothy with branches, wooden sticks, and even the flat side of a knife. On one occasion, Ms. Gonzalez struck young Ferdinan on the head for dropping a piece of avocado on the floor. The boys never spoke about the abuse with each other—a silence born from fear and isolation—and there were no outside witnesses except Ms. Gonzalez's boyfriend, whose only intervention to help the children came when it was far too late. These episodes of abuse were not a handful of isolated events in Ferdinan's life; **it was his daily environment from ages three to thirteen;** and, the same for his older brother from six to sixteen years of age during that same period of time. *PSR ¶¶ 47-50*. The police became involved only once, when Timothy ran away at age thirteen (13) and was physically beaten upon being returned home. *Id*

The most formative and devastating event of Mr. Quinones's youth (beyond never knowing either of his parents) was the sudden illness and tragic, untimely death of his brother Timothy when Timmy was just 16. When Timothy began complaining of headaches it came within the context of the daily physical abuse he and Ferdinan were suffering in the home. Ferdinan recalls that Ms. Gonzalez in fact initially accused Timothy of faking headaches in order to avoid going to school. Indeed, Ferdinan's specific memory is of waking one morning to Ms. Gonzalez violently attacking Timothy—slamming the boy's head into the floor and striking Timothy about his head while she was wearing stainless steel rings. *PSR ¶ 48*. Despite the shocking violence, the boys were sent to school. Later that day, the teachers called an ambulance after noticing Timothy was bleeding from the back of his head. *Id*. Doctors discovered a brain tumor, which was partially removed through an emergency surgical procedure, but Timothy returned home without adequate treatment because, of course, Ms. Gonzalez refused to relinquish custody. *Id*.

4

Evidently, Timothy's father heard about the incident and attempted to intervene and to take Timothy back to the Bronx for treatment, but Ms. Gonzalez opposed it. Tragically, before any transition could occur, the father died by suicide. Days later, Timothy suffered seizures and fell into a coma. As Ms. Gonzalez delayed getting treatment for Timothy he was ultimately brought to the hospital where he was placed on life support. Days later, without Ferdinan being allowed to visit or say goodbye to his brother, Timothy was removed from life support. *PSR ¶ 49*. On the day Ms. Gonzalez informed Ferdinan of his brother's death, she also told him she was placing him in foster care. At age thirteen, he had lost the only person who had shared his childhood, lost the only semblance of family he had, and was thrust alone into the foster care system. The story defies comprehension and still brings immense sadness to Ferdinan.

*ii.     Adolescence in Institutional Settings and Efforts to Build a Life Despite Adversity*

From the period of his brother's death, when he was thirteen (13) forward, Mr. Quinones's life was defined by transience and institutional care. See generally, *PSR ¶ 51-52*. He moved between different living situations[4], including group homes in Puerto Rico and the Bronx, New York—environments he likened to jail, with barred windows, rigid schedules, and frequent fights among adolescent male residents. Staff were often disengaged and there was no consistent adult role model. An aunt's attempt to foster him failed due to her own family's circumstances, and no other relatives stepped forward to care for Ferdinan. *Id ¶ 52*. His teenage years were thus spent in survival mode, without the emotional stability, safety, or guidance that could have taught him healthy coping skills or provided a roadmap to adulthood.

---

[4] Prior to entering the dismal institutional settings of his latter teenage years, Ferdinan briefly lived with the family of a classmate in Puerto Rico, enjoying a rich and nurturing environment for a brief window of time after his brother's death. See generally, PSR ¶ 51; see also, Exh. A, *Statement of Diana Vega Lugo.*

Despite his chaotic and heartbreaking childhood, Mr. Quinones graduated from Mott Haven High School in the Bronx in 2020 and he went on to earn his security guard license with New York State early the following year. See, *PSR ¶¶ 74, 77*; see also, <u>Exh. B</u>, *Security Guard License (info)*. In addition to maintaining his ambition to join the army—an ambition that was frustrated when he was the victim of a stabbing incident (discussing further, *infra*), Ferdinan nearly completed an electrician apprenticeship program through Job Corps in Buffalo, New York during 2022-2023, before returning to the Bronx for the birth of his daughter, in April 2023.

Despite his difficult teenage years and the fact that he has been detained since he was 21, Ferdinan's employment history is characterized by laudable efforts to find his way; demonstrated through several legitimate jobs he has held. Although he admits his criminal offending conduct in the days and weeks leading up to arrest in January of 2024, he had been working as a security guard for Downtown Alliance in New York City during that period of time as well. *PSR ¶ 75*. A couple of years earlier, after obtaining his license from New York State, he had worked security full-time for Allied Security before giving up that work to pursue the aforementioned electrician apprenticeship training in Buffalo. Ferdinan also worked at Services for the Underserved, assisting at a shelter for homeless individuals in 2020. *PSR ¶ 81*. Notably too, Ferdinan applied for a U.S. Army preparatory program to improve his ASVAB score, a goal that reflects his desire for structure and service. *PSR ¶ 76*. While it is clear that this young man has not yet found his professional "calling" or secured the place in his life he wants to occupy, what does emerge from any fair evaluation of Mr. Quinones is the clear view of someone who is and has been striving to do better, to overcome the hand he was dealt and to be the one to break the cycle in his family.

### iii.    *Forming a Family of His Own and Downward Spiral After the Stabbing*

In 2019, Mr. Quinones began a relationship with his high school classmate, Ms. Chasity Montoya. Chasity, who has become a steady and stabilizing presence in Ferdinan's life as well the mother of his child and his partner in life, has spoken at length with the probation department and authored her own statement in support of Ferdinan. See, Exh. A, *Statement of Chastity Montoya.* Indeed, undersigned counsel and his staff can broadly attest to Ms. Montoya's constant, unwavering support of Ferdinan throughout the pendency of this federal prosecution and her emphasis (as well as the defendant's) on doing what is necessary now, while he is incarcerated, to prepare for their life and successful future together.

Together, Chasity and Ferdinan welcomed their daughter, LQ, in April 2023. See generally, Exh. A, *Statement of Chastity Montoya*; see also, Exh. C. *Birth Certificate & Photographs (of Mr. Quinones and his daughter together prior to his detention).* Fatherhood was a turning point for Mr. Quinones.  Up to that point, he had no parents, no siblings, and no extended family to speak of.  This has been especially important to Ferdinan, considering the lack of extended family support during his teenage years, where no one opened their home to him and he was forced to be a ward of the child welfare system. A time where he literally had to figure out life on his own through adversity and constant pressure. For Ferdinan, that personal history informed exactly the experience he did not want his daughter to have in her young life. His partner, and mother of their child, Chasity Montoya, states that from the moment LQ was born, Ferdinan has been determined to be a present and loving father who will always be an important part of her life. See, Exh. A, *Statement of Chastity Montoya*. Having decided to give up on an electrician apprenticeship program[5] (that perhaps he ought to have found a way to complete given his progress), Ferdinan

---

[5] See, *PSR ¶ 75.*

had been researching and making preparations to join the United States Army, realizing the importance of a stable career path and source of income as a new father.

Unfortunately, just weeks after LQ's birth, on May 10, 2023, Mr. Quinones was stabbed multiple times in his wrist, arm and abdomen—all in front of his newborn child. His injuries required surgery to repair severed tendons in his wrist, leaving Ferdinan temporarily unable to grasp basic objects or hold onto anything, including his newborn baby. *PSR ¶ 62*. This incident had a profound impact on Ferdinan as it derailed his plans to attend the military and left him with ongoing pain, numbness, and clear emotional scars considering the effect of his injuries on his family plans and his ability to perform in his daily life.

After the stabbing, Ms. Montoya observed a marked change in Ferdinan: depression, withdrawal, and dissociation from those around him. In both her statement to the probation department and her thoughtful letter to the Court, Chasity describes how Ferdinan began to isolate himself from her, internalizing yet another setback in his young life and coping poorly. See, <u>Exh. A</u>, *Statement of Chastity Montoya*; see also, *PSR ¶ 56*. His coping mechanism—mixing prescribed Oxycodone with alcohol—was dangerous but, as he has acknowledged, a form of self-harm born from an escalating feeling of hopelessness. See, *PSR ¶¶ 67-70*. This period of instability coincided with the conduct at issue in this case, as did his earlier arrest and state matter reported by the probation department. See *PSR ¶ 42*. Ms. Montoya has detailed the context in which Ferdinan's charged conduct was wholly "out of character" for him, and she remains fully supportive of his rehabilitation, and their future relationship noting his inherent value as a father and partner. *PSR ¶ 56*; see also, <u>Exh. A</u>.

iv.     *Current Rehabilitation Efforts and Addressing Defendant's Young Age*

Since his detention, Mr. Quinones has actively participated in parenting classes, stress management programs, and drug counseling. *PSR ¶ 10*. He reports these groups have been beneficial and he has expressed a clear willingness to engage in individual therapy and substance use treatment—services he has never consistently received at any time in the past. This proactive engagement suggests he is not only capable of rehabilitation but already taking meaningful steps toward it. After the initial issues getting acclimated to the war zone that is MDC, his lack of any institutional disciplinary problems for some ten (10) months now, suggests a maturation and trajectory toward a more productive and law-abiding life. *PSR ¶ 9*. Furthermore, Ferdinan has had to own the reality that the stabbing episode left him scared and shaken; and, that he turned to substance abuse to cope- to the great detriment of what he professed to be the most important thing to him—his ability to support his daughter and Chasity. Recognizing his own failings in this regard and demonstrating his openness to both substance abuse and mental health treatment and resources is also strongly indicative of a young man who has realigned his perspective in a positive way.

Critically, Mr. Quinones is only twenty-two years old. He has endured abandonment by both parents, the violent, sudden loss of his only sibling, years of chronic physical, mental and emotional abuse, and the instability and loneliness of the foster care system. Despite these circumstances, Ferdinan has shown the capacity to learn and work productively, to form lasting relationships, and to care for his child. The conduct before this Court is not the story of a hardened career criminal—it is the story of a young man whose life has been shaped by trauma, who stumbled in the wake of fresh violence, and who now seeks the tools, the support and from the Court, *the opportunity,* to rebuild. Ferdinan and Chasity have been working collaboratively; to devise a realistic and attainable post-release plan, should the Court give him the opportunity he

seeks. See, Exh. B, *Ferdinan Quinones Post-Release Reentry Plan* (including descriptions and embedded links to the programs they have researched and believe would be most appropriate and beneficial to Ferdinan and the personal and professional future he is aiming to establish). Undersigned counsel must inform the Court that while counsel had strongly encouraged Mr. Quinones and Ms. Montoya in their efforts to fashion his "reentry plan", counsel cannot take credit for the genesis of the initiative, as it was entirely of their creation.

In assessing this case, the defense urges that it is crucial to recognize the Defendant's very young age as a significant mitigating factor. Being incarcerated at 21 years old, he stands at the earliest threshold of legal adulthood. The United States Sentencing Guidelines explicitly recognize in USSG §5H1.1 (Age) that "age... may be relevant in determining whether a departure is warranted, if considerations based on age... are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." While the Guidelines note that youth alone is not ordinarily relevant, the commentary clarifies that it can be a persuasive mitigating factor when it correlates to a lower degree of culpability, a greater potential for rehabilitation, or circumstances showing the offense conduct is less reflective of fixed character traits and more the product of immaturity or transitory pressures.

Here, the Defendant's youth is paired with powerful additional factors that bring this case squarely within the spirit, if not the letter, of §5H1.1[6]. At 22 years old, his capacity for change is exceptionally high — he is neurologically, emotionally, and socially still developing. Emerging brain science, which underpins modern sentencing practices, recognizes that the human brain does not fully mature until the mid-20s, particularly in the areas governing impulse control, judgment,

---

[6] By referring to this Guideline, the defense is not arguing that a departure under the Guidelines is proper, but merely noting the critical importance of age as a factor, in arguing for the substantial variance sought for Mr. Quinones from his agreed to offense level and sentencing range under the Guidelines.

and foresight. What this means in practice is that the Defendant's poor decisions are far more likely to be reversible behaviors rather than ingrained patterns. In this light, a lengthy prison sentence at such a formative age would not only overstate the true measure of his character but also risk cutting short his prospects for genuine, productive reform.

This case is also defined by a clear point of demarcation in the Defendant's life: the May 2023 stabbing incident. Up until that traumatic event, the Defendant had no criminal record — no adult arrests, no sustained pattern of unlawful behavior. He had endured a difficult upbringing marked by domestic violence, abuse, and neglect, yet had managed to stay mostly free of the criminal justice system throughout his teenage years. The stabbing truly changed everything; and in the most negative of ways. The physical and psychological trauma from such a violent attack being perpetrated right in front of his defenseless, infant daughter introduced a new type of instability and abject fear into Ferdinan's life that had not been present before. In the months that followed, his circumstances — and his mental state — deteriorated in measurable ways that were readily observable to those who cared for him. See, Exh. A, *Statement of Chastity Montoya*.

It is not coincidental that both of his adult arrests occurred after this stabbing. The first came in the immediate months following the incident, and the second followed in January 2024. In other words, these offenses are not part of a longstanding pattern of criminality but rather a clustered, post-trauma downturn. Recognizing this sequence is critical. It allows the Court and the prosecution to see these incidents not as the emergence of a criminal identity, but as symptomatic of an acute period of instability triggered by a single, extraordinary act of violence against him.

Seeing the Defendant's conduct for what it truly was — as an aberration in an otherwise law-abiding young life, catalyzed by trauma — is precisely the type of individualized assessment that §5H1.1 contemplates. Ferdinan's age amplifies the mitigating weight of these circumstances: a 21-

11

year-old, freshly exposed to severe violence, lacking the life experience or coping tools to navigate that trauma, is far more likely to react impulsively and unwisely than a mature adult with established resilience. This is not a matter of excusing the conduct; rather, it is about placing it in its proper human and developmental context.

For these reasons, as well as those discussed, *infra*, concerning the § 3553(a) factors yet to be discussed, a below guidelines sentence of 24 months would not only be just and proportionate but would align with the rehabilitative principles that the Guidelines, and indeed our justice system, increasingly value. Such a disposition would allow the Defendant to continue his forward momentum — maintaining employment, pursuing counseling, and completing community service — without the permanent and disproportionate burden of a criminal conviction. It is the defense's position that the Court should weigh heavily the extraordinary personal history and characteristics of Mr. Quinones. A sentence that recognizes the profound mitigating circumstances of his upbringing, acknowledges his demonstrated work ethic and commitment to his family, and prioritizes rehabilitation over prolonged incarceration for this very young offender would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

*18 U.S.C. § 3553(a)(2)(A) – the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

Ferdinan Quinones has come to fully recognize the seriousness of the offense he has committed (as well as the other, dangerous, associated conduct) and for which he now stands before this Court to receive judgment. As someone who has struggled in recent years with substance abuse and addiction himself, Ferdinan knows the power destructive drugs hold over individuals consumed by them and how that destroys those around them, in particular, their

12

families and society as a whole. Just as Ferdinan understands the significance of his transgressions, he also appreciates the Court's duty to mete out just punishment in the interest of the public good in order to promote respect for the law and to prevent him from committing further crimes. Moreover, he has come to realize that it is in his own best interest that this Court provide to him the individualized and fair punishment for his wrongful actions. In a very real sense, Mr. Quinones appreciates and has come to internalize the understanding that the punishment of his incarceration has been deserved. He would simply pray that the Court simultaneously hold dear the notion that he truly needs help in addressing those dominating sources of personal turmoil that underlie his recent offending and his still very tender age after a childhood he had no control over, while also imposing the just punishment for his failure to find that help before resorting to committing the instant crime.

*18 U.S.C. § 3553(a)(2)(B) – The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Activity*

Beyond the need for the imposed sentence to deter Mr. Quinones from reoffending[7], a sentence commensurate with the defense's recommendation reflects the seriousness of the offense and exhibits to the community that dealing in this type of criminal behavior will be punished by a substantial punishment, including a significant loss of liberty, irrespective of an individual's personal circumstances. In that vein however, fixing a carefully considered and individualized sentence for Mr. Quinones that is based upon his unique history and circumstances, as well as his conduct (and the other panoply of relevant sentencing considerations under the statute), the Court demonstrates its exclusive ability to strike the balance-- to fix the correct and just punishment for each individual that comes before it. In a society where the populous sees that justice for each

---

[7] This concept of "specific deterrence" to Mr. Quinones from reoffending is addressed *infra*, in the discussion of 18 U.S.C. § 3553 (a)(2)(B).

individual defendant is in fact flowing from the Court, a respect for the law and for law-abiding behavior grows the strongest and is sure to be the most enduring.

*18 U.S.C. § 3553(a)(2)(C) – The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant*

As anticipated at the time of plea, Mr. Quinones' criminal history category is I due to his lack of any other criminal convictions. See generally, *Plea Agreement; PSR at ¶¶38-40*. While Ferdinan has incurred no other qualifying adult convictions, Mr. Quinones nevertheless acknowledges that he did have an arrest on another matter in late 2023[8], *after he was the victim of a stabbing,* when his decision-making had significantly deteriorated as described, *supra,* and by his partner Chasity[9]. Defense counsel is pleased to report to the Court that as of the date of this submission, counsel has received confirmation from the bureau chief of the Bronx County District Attorney's Office that this matter (constituting Ferdinan's only other adult arrest) is presently being advanced for full dismissal.[10]

Ferdinan knows that he needs to complete a process of personal development that will resemble a transformation and rehabilitation.  He also strives to show those who know him best, that they will recognize his actions as simply completing his own maturation process.  Such growth will allow him to put away the distractions and poor-coping techniques of the past. He is ready to be man- a consistent and humble provider, father and husband. Ferdinan knows that it will take everything that he has inside of him each day for the rest of his life to be successful in making that transition away from this path of destruction he set himself on in 2023. Critically, he knows he

---

[8] See generally, *PSR ¶ 42.*
[9] Exh. A, *Statement of Chasity Montoya.*
[10] Counsel was informed on August 12, 2025, that the state matter will be dismissed, likely prior to the federal sentencing herein.

14

cannot do it alone and fortunately, this time, he will not have to. Ferdinan needs the love and support of Chasity and his quickly growing young daughter, as well as the grace and support of the society he has transgressed against. He will make use of the tools and resources he needs to make a real and lasting change into a person from whom the public needs no protection whatsoever. Ferdinan can only stand before the Court with his young eyes now fully open and ask for just mercy along with just punishment.

*18 U.S.C. § 3553(a)(2)(D) – the need for the sentence imposed to provide the defendant with needed educational of vocational training, medical care, or other correctional treatment in the most effective manner*

Mr. Quinones is asking the Court to sentence him in such a way that will allow him to continue to develop the skills and coping mechanisms that will enable him to live as the valuable and contributing member of society he and his loved ones know him to be. As noted above, he has made some positive programming strides while incarcerated including classes to assist him in developing parenting skills, as well as substance abuse treatment, and stress management. *PSR ¶ 10*. He and Chasity have, of course, done much brainstorming, researching and discussing of life post-release, in devising a preliminary reentry plan. See, <u>Exh. B</u>. As his greatest needs seem to center around his recent substance abuse which has been a coping mechanism for significant childhood trauma, Ferdinan prays that the Court recommend his designation at a facility in the northeast region that has a Residential Drug Abuse Program (RDAP) as well as a Resolve Program[11]. Mr. Quinones has come to regard his time incarcerated (regardless of how much longer it will extend for him), as an opportunity to turn his punishment into a period of self-improvement

---

[11] The Resolve Program, born out of the First Step Act, is a cognitive behavioral therapy program designed to address the trauma-related mental health needs of inmates. See, *First Step Act, Approved Programs Guide* at: https://www.bop.gov/inmates/fsa/docs/fsa_program_guide_202010.pdf

in every possible way. It appears that two (2) facilities in the northeast region offer both the RDAP and the Resolve programs, those being USP[12] Lewisburg (PA) and FCI Danbury (CT). These are also facilities that will at least be conceivably within travelling distant for Chasity and young LQ.

*18 U.S.C. § 3553(a)(3) – The Kinds of Sentences Available*

The Court has before it a range of sentencing options. The offense to which Mr. Quinones has pled guilty and now stands for sentencing is one to which no mandatory minimum sentence is assigned by statute, and the maximum term is 20 years. See, 21 U.S.C. § 841(b)(1)(C). The stipulated[13] Guidelines range (for cocaine base[14]) of 108-135 months, certainly goes well beyond what is sufficient and necessary in this case. The Court has the discretion to sentence Mr. Quinones to a slightly, moderately[15], or significantly lesser sentence than that which is set forth under the advisory Guidelines, as appropriate, in consideration of the totality of the circumstances, should the Court agree with the defense (and the probation department) that a substantial downward variance is indeed warranted.

*18 U.S.C. § 3553(a)(4) – The Guidelines and Guideline Range*

Based on the total drug (cocaine base) weight assigned to Mr. Quinones' conduct, and for which he has accepted responsibility in pleading guilty, his offense level of thirty-two (32) is reduced by three (3) points to twenty-seven (29) but is then again increased by two (2) levels due

---

[12] The RDAP program appears to be offered at the adjoined satellite camp.
[13] See, *Plea Agreement*; see also, *PSR* ¶26-36.
[14] See discussion, *infra*, citing *Plea Agreement & PSR*.
[15] As reflected in the probation department's recommendation for a downward variance to 60 months based on Mr. Quinones very young age, experience of childhood privation, abandonment and abuse as well as his substance abuse history. See, *PSR, Sentencing Recommendation, Justification*.

to USSG §2D1.1(b)(1)[16], raising it to thirty-one (31) and computing to the 108-135 month of incarceration guideline range given his lack of criminal history. See generally, *Plea Agreement*, *PSR*. While the government and defense have agreed (and the probation department has concurred) in finding that the cocaine base offense level is proper, the government will nevertheless ask the Court to consider the powder cocaine guidelines rather than the cocaine base guideline. See, *Plea Agreement; see also, PSR ¶ 8(c)(iii)*. Using the powder guidelines under USSG § 2D1.1(c)(8), Mr. Quinones's advisory Guidelines range would be 46 to 57 months' imprisonment, less than half of the range he is currently faced with due to the use of cocaine base guideline. The defense joins the government in asking the Court to consider the powder cocaine rather than the cocaine base guideline in conducting its sentencing analysis, which addresses the inappropriate disparity between the ranges.


*18 U.S.C. § 3553(a)(5) – Any Pertinent Policy Statement issued by the Sentencing Commission*

There is no applicable policy statement of the Sentencing Commission that is applicable to Mr. Quinones' conviction or case.

*18 U.S.C. § 3553(a)(6) - The Need to Avoid Unwarranted Disparities in Sentencing of Similarly Situated Defendants Convicted of Similar Conduct*

Mr. Quinones is clearly facing a very substantial sentence of imprisonment given his conduct and his age[17]. Notably, Ferdinan's conduct in this case consisted of a series of low-level "street" transactions in which he sold crack cocaine in conjunction with others. This case was

---

[16] Notably, Mr. Quinones' offense level is, in reality, four (4) points higher than it would be without the effect of the firearm enhancement. As a 0-point offender in terms of criminal history he would have enjoyed a 2-point reduction to his offense level under USSG § 4C1.1 and thus his total offense level would have been 27, resulting in a range of 70-87 months' imprisonment.
[17] The high end of his guidelines' range represents more than half of Mr. Quinones' life to this point.

17

initiated, of course, by state law enforcement (NYPD) and, counsel submits, would normally have been prosecuted in state court. For reasons unknown to defense counsel, the federal government took up the state matter. That was an unfortunate consequence for Mr. Quinones. Nonetheless, Ferdinan has accepted responsibility, plead guilty, acknowledged the destructive path he had begun to go down and now must face due punishment in the form of this Court's sentencing determination. Whatever agency is handling the ultimate prosecution of his criminal offending is not something Mr. Quinones dwells upon nor complains about.

The probation department has the relevant information from the U.S. Sentencing Commission's database to aid the Court in determining the precise sentence to impose for Mr. Quinones in this case. See generally, *PSR, Judiciary Sentencing Information (JSIN)*. Notably, the sentencing data for offenders with the same offense, guidelines range and criminal history, reveals average and median sentences of 69 months over the last five (5) years, reflecting variances of some marked significance being applied at the national level, even for those not receiving substantial assistance (5K1.1) letters from the government. *Id*.

With respect to the more localized statistics, where the average sentence for all (not only those similar situated statistically) drug trafficking offenders nationally was 82 months, in the SDNY the average was 73 months (more than 10% lower). See, Exh. D, *USSC, Statistical Information Packet, Fiscal Year 2024, Southern District of New York, Table 7*[18]. Looking at the more than 10% lower sentence length than the national average for all drug trafficking offenders in the SDNY, as well as the resultant 69-month sentence that is the national average for those

---

[18] Nationally, 28.5% of drug trafficking offenders were sentenced within their applicable guideline range while 41.5% received (an almost always) a downward variance. Comparing the SDNY to national numbers, just 13.5% of offenders in the SDNY received a sentence within the prescribed guideline range with 75.6% of drug offenders receiving a variance from their sentencing court. Exh. D, *USSC, Statistical Information Packet, Fiscal Year 2024, Southern District of New York, Table 10*.

similarly situated defendants over the last five (5) years (See, *supra,* discussing the JSIN data), such a combined analysis would suggest that a sentence of some 6.9 months less, or 53 months, would be closer to an expected sentence for Mr. Quinones' to receive, simply on average, in this district. However, that is, of course 1) using the cocaine base Guideline and, 2) not considering Mr. Quinones many compelling individual mitigating circumstance justifying a greater variance than a Court might customarily consider for a typical defendant.

Going beyond the statistics, the probation department has found significant reasons for the Court to consider a serious variance from the guidelines just as they have from the cocaine base guideline. The department bases their recommendation on Mr. Quinones' very young age, his manifestly deprived and traumatic childhood (where he never knew either parent or any true parental figure), lost his only sibling at just 13years of age, and which included serious physical abuse at the hands of caretakers, as well as the outsized role substance abuse in response to a traumatizing, destabilizing event has played in his offending. See, *PSR Addendum, Justification*. The defense, of course, agrees that these are the panoply of important mitigating factors present before the Court and given the presence of these factors in Mr. Quinones' case, and respectfully requests that the Court consider the statistical information cited herein in fashioning its viewpoint with respect to the proper sentence. As a result, the defense posits, when compared to other similarly situated defendants, Mr. Quinones should indeed be granted a significantly greater downward variance on account of his unique constellation of equities.

When the statistical analysis is combined with the unique collection of manifestly compelling, mitigating circumstances that are present here and then, if the Court were to substitute in the resulting powder cocaine guideline range (46-57) endorsed by the Government, the defense recommendation emerges as a rational and well-supported option. Given the justifiable 53-month

19

number when using the cocaine base guideline range and discussed, *supra*, it is sensible that if the range were less than half, the ultimate number of months recommended would be less than half as well. Accordingly, the defense respectfully and humbly submits that a sentence of 24 months' imprisonment is adequately justified through adherence to 18 U.S.C. § 3553(a)(6) alongside all of the other statutory factors and relevant considerations the Court is required to weigh and synthesize in reaching its determination.

*18 U.S.C. § 3553(a)(7) – The Need to Provide Restitution to Victims*

As there is no identifiable victim in this offense[19] restitution is not applicable pursuant to 18 U.S.C. § 3663. *PSR ¶101-102.*

*Conclusion - Sentencing Recommendation*

After considering the applicable sentencing guideline range for cocaine base as well as that of powder cocaine, Mr. Quinones' offending conduct, the strongly mitigating nature of his tender age and his dreadful childhood, as well as his marked strides to establish a life, career and family of substance, counsel respectfully submits that a significant downward variance is warranted in this case. This recommendation is in keeping with the "even-handed" spirit of the "parsimony provision" of 18 U.S.C. § 3553(a) in accounting for the need to not sentence Ferdinan to a disproportionately greater period of incarceration than is truly necessary in order to accomplish the goals of sentencing. In the defense's view, the Court can very rightly see its sentencing determination as an opportunity to provide Mr. Quinones with a chance that he can either make the very most of. He has a beautiful young family that loves and supports him—indeed he has a

---

[19] *PSR ¶¶19, 25.*

family for the first time in his life. The Court can give him a chance to return to that family very soon and earn the ability to remain part of their lives each and every day in the years ahead. For his part, Mr. Quinones knows he will not squander any opportunity to be with his family ever again and he has dedicated himself wholly and completely to being the present, involved and loving parent to his daughter that he never had in his own life. Through counsel, Mr. Quinones respectfully prays to this Court to afford him that chance and allow him to prove his worthiness for compassion and leniency despite his acknowledged transgressions.

Sincerely yours,

//s// David J Cohen //s//
David J. Cohen
Cohen Forman Barone, PC
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com